BANKERS' MONEY ORDER ASS'N v. NACHOD et al.

(Supreme Court, Appellate Division, First Department.    October 23, 1908.)

1. CORPORATIONS (§ 425*) — OFFICERS AND AGENTS — ESTOPPEL TO DENY AU-
THORITY.
   Where stockholders had full knowledge of the business relations exist-
   ing between the corporation and the firm of which a person selected as
   director and as president and ex officio chairman of the executive commit-
   tee was a member, the corporation cannot claim that it should neither be
   bound nor estopped by the action of the executive committee because such
   person was a member thereof and may have exercised some influence over
   his fellow members in his firm's interest and contrary to the corporation's
   interest.
   [Ed. Note.—For other cases, see Corporations, Dec. Dig. § 425.*]

2. CORPORATIONS (§ 90*)—ACTIONS ON STOCK SUBSCRIPTIONS—EVIDENCE—SUF-
FICIENCY.
   Evidence examined, and a finding that defendants agreed to subscribe
   for the entire issue of preferred stock of plaintiff corporation, and that the
   agreement was not merely that if plaintiff would offer the stock for sub-
   scription, and the same should not be taken, then defendants and other
   underwriters would take the unsold balance in proportion to their respec-
   tive underwritings, held against the weight of the evidence.
   [Ed. Note.—For other cases, see Corporations, Dec. Dig. § 90.*]

Appeal from Trial Term.

Action by the Bankers' Money Order Association against Friedrich
Nachod and others on a stock subscription. From a judgment for
plaintiff, and an order denying a new trial, defendants appeal. Re-
versed, and new trial ordered.

Argued before INGRAHAM, LAUGHLIN, CLARKE, HOUGH-
TON, and SCOTT, JJ.

Morgan J. O'Brien (Antonio Knauth, George T. Hogg, and Harry
W. Alden, on the brief), for appellants.

Charles F. Brown (James R. Ely, Charles Stewart Davison, and
Andrew J. Dewey, on the brief), for respondent.

LAUGHLIN, J.    The appellants and Alfons Jacobson and Max
Hessburg, who were originally joined as defendants but died pending
the action, composed the copartnership firm of Knauth, Nachod &
Kuhne, which conducted the business of bankers in the city of New
York and in Leipsig, Germany. The plaintiff is a foreign corporation.
It was incorporated under the laws of New Jersey on the 12th day
of April, 1899, with an authorized capital stock of 5,000 shares, con-
sisting of 500 shares of preferred stock, of the par value of $50,000,
and 4,500 shares of common stock, of the par value of $450,000.    By
an amended certificate of incorporation, which was duly filed in the
office of the Secretary of State of New Jersey on the 11th day of
July, 1901, and was duly authorized at a meeting of the stockholders
held on the 25th day of May, 1901, and by a formal consent in writ-
ing executed by more than two-thirds of the stockholders on the 29th
day of May, 1901, the common stock was reduced to 2,000 shares, of

---

the par value of $100 each, and the preferred stock was increased to 1,000 shares, of the par value of $100 each. This action is brought to recover the sum of $28,800 claimed to be due from the defendants to the plaintiff on a subscription·for the entire issue of preferred stock at par; it being alleged that the defendants, pursuant to such subscription, paid for and received 712 shares and defaulted as to the balance.

The principal issues in the case are: (1) Whether the alleged subscription agreement was an executed or an executory contract; (2) whether the subscription was absolute or on conditions, it being claimed by the defendants that they merely agreed to enter into an agreement to subscribe for the stock and that they were to be obligated together with certain underwriters to take only the balance of the issue of preferred stock·which they were unable to otherwise dispose of to bankers in various parts of the country, as contemplated by the parties; (3) whether the subscription agreement, if made, was not canceled by mutual consent; and (4) whether the plaintiff is not estopped from now enforcing the subscription agreement as to the balance. The claim of the plaintiff on these points, as shown by the allegations of the complaint, is that:

"On or about the 4th day of June, 1901, the defendants duly subscribed for and agreed with the plaintiff to take one thousand (1,000) shares of plaintiff's preferred capital stock, and then and there agreed to pay to this plaintiff the sum of one hundred (100) dollars per share for said stock or the sum of one hundred thousand dollars."

Plaintiff further alleges that it performed the subscription agreement on its part and issued to the defendants, "between June 4, 1901, and January 6, 1904, the said 1,000 shares of the said preferred capital stock of the plaintiff," and demanded payment of the $100,000, no part of which, excepting the sum of $71,200, has been paid; and judgment. is demanded for the balance, being $28,800, together with interest thereon from the date of the tender of the stock, besides costs. The allegations in the complaint with respect to the incorporation of the plaintiff, and the amount, nature, and increase of its capital stock, were admitted; but the other material allegations were denied.

The defendants pleaded, in substance, as separate defenses: (1) That the alleged subscription agreement was not in writing and was void under the statute of frauds; (2) that the alleged subscription agreement was based upon and made with a view to carrying out a certain underwriting agreement made on the 18th day of April, 1901, by the defendants, at the instance and request of the plaintiff, with certain other persons, by which they agreed that if the plaintiff would offer its preferred stock to the banks and bankers of the country through defendants, as its agents, and if the same should not all be taken, then the defendants and the other underwriters would take the unsold balance in proportion to their respective underwritings, and that thereafter plaintiff, through the defendants as its agents, placed with and issued to banks and bankers 712 shares of its preferred stock and received therefor the sum of $71,200, and subsequently decided that the amount thus realized was sufficient for its needs, and decided

not to issue the balance of the preferred stock, and so notified the defendants and the other underwriters; and (3) that plaintiff, by delay in asserting the claim and by a course of conduct extending over a long period and inconsistent with its present contention, is estopped from claiming that the defendants are liable as subscribers for the balance of the issue of the preferred stock.

The learned counsel for the appellants contend that the theory upon which the case was tried in behalf of the plaintiff was the same as that presented by its pleading, namely, that the subscription agreement was an executed contract, which is not sustained by the proof, and that the recovery cannot be sustained now upon the theory that defendants entered into a contract to subscribe and pay for the stock in the future, which is the theory upon which the learned counsel for the respondent seeks to hold the judgment, claiming that it is the theory upon which the case was tried.

The plaintiff was promoted by one Edwin Goodall, who held certain patents granted by the United States upon money orders, drafts, and checks. Twelve days after the incorporation of the plaintiff, Goodall assigned these patents to it, and in consideration therefor 4,490 shares of the common capital stock were issued to him. The remaining 10 shares of the common stock were sold at par, and the proceeds, of $1,000, was the only money that came in the treasury of the plaintiff until it received the amount realized on the sale of the preferred capital stock by or to the defendants, excepting moneys borrowed from its president as hereinafter stated. The original authorized issue of 500 shares of preferred stock was never issued, although efforts to sell the same during the two years preceding the inception of the negotiations with the defendants were made without success. In April, 1901, when defendants were induced by Goodall to aid in financing plaintiff, it was indebted, principally to its president, for moneys advanced in the sum of $6,520. It had made every effort, but had been unable down to that time to commence business; but through the assistance of defendants it was enabled to pay its obligations and start business October 1, 1901, with a fair working capital. Goodall became one of the first directors of the plaintiff, and he became its first treasurer, and so continued until the 18th day of September, 1906, when he resigned; but he was not one of the incorporators, doubtless for the reason that he intended to sell his patents to the company He remains, so far as the record shows, very largely interested in the plaintiff. The plaintiff was organized for the purpose of conducting with banks the business of selling money orders upon substantially the same basis as express companies carry on similar business The prospectus it issued describes the business which it contemplated doing as follows:

"This association is designed to supply the banks of the country with a convenient and simple medium for the transmission of small sums of money. Its purpose is to aid the banks in reclaiming a feature of their business which has drifted into other channels, namely, the selling and buying of money orders."

The money orders to be issued were to be payable at any bank, but to be finally redeemed by plaintiff in New York. Goodall was instrumental in inducing the defendants to investigate the merits of the

proposed business, and they decided to become interested in the plan, provided that certain conditions which they deemed essential to the success of the enterprise were complied with. These were, according to the undisputed evidence, that the common stock of the plaintiff be reduced to $200,000, and the preferred stock be increased to $100,000, and that it be a 7 per cent. accumulative nonvoting stock, redeemable after five years, and that some effective arrangement should be made whereby the entire issue of common stock, as reduced, should be deposited under a voting trust agreement for five years.

It is contended on the part of the plaintiff, but controverted by the defendants, that the defendants imposed the further conditions that defendant Kuhne should become a director and president of the plaintiff, and one of defendant's employés should be made secretary, and that defendants should become plaintiff's fiscal agents and keep its accounts, and that, upon compliance with these conditions, defendants agreed to subscribe outright for the entire issue of preferred stock and to pay cash therefor, from which plaintiff's indebtedness was to be paid, and that defendants were to do all things necessary to finance the company. In so far as the defendants concede that they imposed conditions precedent to their becoming interested in the plaintiff, their claim is that this was done with a view to furnishing the plaintiff substantial financial backing in the nature of underwriting for the $100,000 of the preferred stock, which, as agents of plaintiff, they were willing to undertake to dispose of to banks and bankers throughout the country, with the understanding that the underwriters should take any balance not thus placed. With this end in view, defendants claim that, with the knowledge and active assistance of the plaintiff's officers and directors, they entered into an underwriting agreement on the 18th day of April, 1901; many of the officers and directors of the plaintiff becoming subscribers thereto. The plaintiff is not a party to the underwriting agreement. It antedates the agreement upon which the action is founded, and defendants claim that the alleged subscription agreement was made with reference thereto.

The learned counsel for plaintiff draws attention to the underwriting agreement as showing that the defendants intended thereby to underwrite in part the primary liability which they contemplated incurring in subscribing for the entire issue of the preferred stock. The underwriting agreement was made by the defendants as parties of the first part and seven individuals as parties of the second part. It recites that plaintiff was about to issue preferred stock of the par value of $100,000 and to reduce its common stock to $200,000, and that the subscribers had agreed "to and with each other to underwrite said issue of preferred stock." The defendants agreed with the underwriters that they would first offer the preferred stock for sale generally at par. Each of the underwriters agreed, in the event that any preferred stock should remain "after the conclusion of the efforts" of defendants to sell the same, to purchase the number of shares of the preferred stock set opposite his name, at par, on tender of the stock, receiving therewith an amount of the common stock equal to 30 per cent. of the amount of the preferred stock thus taken

by him. The authority of defendants to offer the stock for sale was assumed, without being stated, in the agreement. The agreement was to become operative only in the event that the entire amount of the preferred stock should be subscribed for thereunder; but this was done prior to the 4th day of June, 1901. The defendants themselves subscribed for 250 shares, and defendant Kuhne, individually, subscribed for 100 additional shares. One Wicker, a director and vice president of the plaintiff, subscribed for 250 shares, and one Stumpf, director and secretary of the plaintiff, subscribed for 50 shares. Others subscribed for the remaining 350 shares. Goodall, the treasurer of the plaintiff, and upon whose testimony it relies principally as sustaining the recovery, did not become a subscriber to the underwriting agreement; but he was familiar with it, and was instrumental in having his personal counsel, Mr. Littlefield, subscribe for 30 shares, and took some part, at least, in procuring the subscriptions of Pearson for 30 shares and of Stumpf for 50 shares.

Subjoined to the underwriting agreement was a statement of the existing indebtedness of the plaintiff, which it was contemplated would be paid from the proceeds of the sale of the preferred stock. Goodall testified that during the year prior to the 29th day of April, 1901, he had many interviews with the defendant Kuhne, with a view to inducing the defendants to finance the business of the plaintiff, and that shortly prior to the 29th day of April, 1901, he stated that his firm would take the plaintiff and reorganize it on the basis hereinbefore stated, taking the entire issue of preferred stock, which would give the company capital on which to commence business; that a meeting of the board of directors was called for the 29th day of April, 1901, for the purpose of discussing the proposition suggested by the defendant Kuhne, who was present by invitation; that Kuhne there stated that his firm would take the entire issue of the preferred stock and pay cash for it; and that, if plaintiff would agree to his proposition, he would take the presidency and reorganize the company. Secretary Stumpf testified that Kuhne was present at this meeting and said that his firm "would place the $100,000 of preferred stock" if the common stock were reduced and the preferred stock increased as stated, and that his impression was that the defendants were to pay for the preferred stock, and that the purpose of the underwriting agreement, which he signed, was to have the subscribers become underwriters for the defendants. The minutes of the meeting shed no light on the question.

At the meeting of the stockholders held on the 25th day of May, 1901, pursuant to a resolution adopted by the board of directors on the 19th day of April, 1901, which was duly called, and of which all stockholders had due notice, and at which the common stock was reduced and the preferred stock increased, the by-laws of the plaintiff were amended so as to provide that a quorum of the board of directors should consist of not less than seven members, and by providing for an executive committee, to consist of the president and six other directors, to be appointed by him "by and with the approval of a quorum of the board of directors present at any meeting," and

that the executive committee should meet at such times as the president shall designate, "and shall exercise all the powers of the board of directors when the same is not in session." The amended by-laws also provided that the executive committee should keep regular minutes of its proceedings in a book to be provided for that purpose, which should always be open to the inspection of any of the directors. At this time a new board of directors, consisting of 23 members, was also elected, many of whom were bankers residing in various places throughout the country, which rendered frequent meetings of the board impracticable. More than two-thirds of the common stock was voted at this meeting. At the meeting of the board held on the 4th day of June, 1901, the minutes of the meeting of the stockholders held on the 25th day of May, 1901, including their action in amending the by-laws, were read and approved. At that meeting defendant Kuhne, having been elected a director, was elected president of plaintiff.

Goodall also testified that a meeting of the board of directors on the 4th day of June thereafter, at which eight members were present and Kuhne presided, he had a conversation with Kuhne, and informed the board that he was authorized to state in behalf of Mr. Kuhne that his firm would take the entire issue of preferred stock and pay for the same at once; that a resolution was thereupon adopted, accepting the proposition. He also said that it was understood between him and Kuhne that the latter was to reorganize the company and pay its debts, and that the debts were paid by defendants, which is scarcely consistent with the theory of a cash subscription for the entire issue of stock. Goodall acted as secretary at this meeting, and the minutes kept by himself do not sustain his testimony. He did not seem to appreciate that the minutes differed from his testimony; for he also testified that the minutes, as entered in the book of minutes, were prepared from his minutes by counsel for plaintiff, and that as thus entered in the book of minutes of the board they correctly showed what took place. The minutes as entered show that a resolution was adopted:

"That a subscription to the preferred stock of the association, as authorized at the last meeting of the stockholders of the association, should be duly opened."

No formal action of the stockholders with respect to authorizing subscriptions is shown. Immediately after the record of the adoption of this resolution, the minutes of that meeting show the following:

"Mr. Goodall announced that the firm of Knauth, Nachod & Kuhne, of New York City, on behalf of persons whom they were authorized to represent, would subscribe for the entire amount of the preferred stock of the association, namely, one hundred thousand dollars ($100,000), at par. After some discussion and due deliberation, and on motion, duly seconded, it was unanimously resolved that the offer of Messrs. Knauth, Nachod & Kuhne, as announced by Mr. Goodall, should be accepted, and counsel was thereupon directed to draw up a suitable subscription agreement for the preferred stock and supervise the execution thereof by Messrs. Knauth, Nachod & Kuhne."

Goodall admitted that he knew about the underwriting agreement, and, referring to the offer recited in this entry, said:

"I don't know all of the persons on behalf of whom they made this offer. I wrote those words in the minutes. It is my writing, and that is the way in which the matter was announced."

Vice President Wicker testified that he heard the defendant Kuhne approve the statement, read at that meeting by Goodall, "to the effect that if a certain thing was done with the stock that he would subscribe and pay for the preferred stock of the association," and that his understanding was that defendants were at liberty to sell the stock at any price, and he did not recollect the announcement as being made by the defendants on behalf of persons whom they were authorized to represent; but he also said that the minutes correctly showed the action taken. He also said that Goodall read from a proposition in writing. No such proposition was produced on the trial, and Goodall did not testify that he had or read from a proposition in writing. There is conflicting evidence as to whether the underwriting agreement of April 18th was discussed at that meeting; but, whether it was discussed or not, the majority of the members of the board of directors then present were familiar therewith. At the same meeting Messrs. Alexander & Colby, the latter being a director of the plaintiff, were appointed counsel for plaintiff, and the newly elected president announced the appointment of six members of the board of directors to constitute, with himself, acting ex officio, the executive committee. The record does not disclose any formal resolutions by the board of directors approving the appointment of the members of the executive committee; but it appears that the appointment of such members by the president was acquiesced in without formal approval, and they served, apparently to the knowledge of more than a quorum of the board of directors, without protest or question, and the regularity of their appointment is not questioned. The subscription agreement authorized by the resolution adopted at this meeting was never prepared or executed. Goodall admits that the understanding was that a formal agreement was to be prepared and signed, and says that failure to do so was caused by the negligence of the attorneys for plaintiff.

The defendant Kuhne and one Sager, an employé of the defendants, who at their instance became a director and secretary of plaintiff, were the only other witnesses who gave evidence concerning the proceedings of June 4th. They testified, in substance, that the offer of the defendants, announced by Goodall, was not to subscribe for the stock themselves, but to guarantee for themselves and the underwriters that they would take the balance of the issue of preferred stock, which plaintiff, with the assistance of the defendants, was unable to place with other banks and bankers. The defendant Kuhne testified that his attention was drawn to the plaintiff's scheme for conducting business by a representative of the defendants' firm, who met Goodall at the annual meeting of the American Bankers' Association in 1898, and that later on Goodall called on him with reference thereto; that at the next annual meeting of said association defendants found that bankers generally thought well of the plan, and that thereafter the defendants took the matter up actively; that it was his suggestion that the common stock be reduced, and that the preferred stock be increased and made a 7 per cent. accumulative stock, redeemable in

five years, and that a voting trust agreement with respect to the common stock be made; that the underwriters' agreement was discussed fully with Goodall before anything was done, and was brought to the attention of plaintiff's directors and discussed fully with them, and that it was so presented and discussed at the meeting of the board held on the 4th day of June, 1901, at which time it had been signed by all the parties; that the underwriting agreement of April 18th was made for the purpose of financing the preferred stock and paying off plaintiff's existing indebtedness; that the discussion at the meeting of June 4th was to the effect that the syndicate composed of the underwriters had been formed to guarantee the sale of the entire issue of preferred stock in the event that defendant should be unable to place it with banks in blocks of not more than five or ten shares for plaintiff, or, in other words, that the underwriters would take the balance not thus sold. He admitted, however, that it was understood that the defendants with the underwriters guaranteed the sale of the entire issue by agreeing to take such part thereof as was not pledged with other bankers; but he denied that he agreed that his firm would take and pay for the entire issue. It is undisputed that on or about the 6th day of June, 1901, a letter, known as "Exhibit 2," purporting to have been written by the secretary of the board of directors, was written and mailed to each director, reciting, among other things, that it was the sense of the board at that meeting that the preferred stock be offered in blocks of five shares or under to the banks of the country. Plaintiff claimed that defendant Kuhne directed it written, and defendants were made to show the authorship of the letter.

Kuhne also testified that, in the discussion at the meeting of the board on June 4th the members of the board manifested a desire to have the stock distributed among banks as widely as possible, with a view to obtaining customers and creating business for the plaintiff, and that it was understood that the preferred stock was to be sold at par in blocks of not more than from five to ten shares, and that he favored this course as most advantageous to the plaintiff; that the details of sending out subscription circulars were also discussed and left to the executive committee; and that everything was done thereafter under the direction of the executive committee. A circular, dated June 22, 1901, was thereafter prepared and issued in the name of the defendants' firm, containing a subscription blank at the head of the circular, to be signed by bankers subscribing for the stock, addressed to the defendants' firm. The circular purported to be issued by the defendants' firm, and was addressed: "To the members of the Bankers' Association." It stated that subscriptions in writing on the blank inclosed might be addressed to the defendants, and that no more than ten shares would be allowed to one subscriber, and also stated that the issue was to be limited to banks and bankers, and the nature of the business which plaintiff was organized to conduct. It stated that plaintiff would supply banks, free of charge, blank forms of money orders bound in books with stubs, and that the bank issuing the money order would remit to plaintiff at intervals of not more than a week the amount received for issuing the order, which should be divided be-

tween the bank issuing the order and plaintiff. The minutes of the meeting of the executive committee of the plaintiff, held on the 13th day of June, 1901, show that the executive committee ordered 5,000 copies of this circular and subscription agreement to be mailed to banks, "inviting their subscription to preferred stock," and it was decided that the executive committee should meet every Thursday. The minutes of the meeting of the executive committee held on the 27th day of June, 1901, show that Goodall was elected secretary of the committee, and that Kuhne reported that defendants had received subscriptions for 300 shares, and that a notice was directed to be sent to all banks, showing that plaintiff was "ready for business and inviting their support," and that Goodall had visited bankers in North Carolina with good results and he was requested to attend a meeting of the Bankers' Association of Pennsylvania. At a meeting of the executive committee held on the 18th day of July, 1901, a resolution was adopted, requesting the "American Banker" to address 5,000 envelopes of the defendants and mail subscription circulars therein to the members of that Association who had a capital of $50,000 or under. At meetings of the executive committee held on July 25 and August 1, 1901, the secretary reported having mailed 5,000 subscription blanks for preferred stock to different banks, and at the latter meeting he was asked to mail another 1,000.

Kuhne also testified that the sales of the stock were discussed with Goodall, and every subscription that came in was talked over with him, and that requests to cancel subscriptions were submitted to him; that defendants were instructed by the plaintiff to cancel subscriptions where request for cancellation was made; that defendants kept three accounts with the plaintiff—one a disbursement account, showing disbursements made on its account in obtaining subscriptions for stock; another a subscription account, wherein plaintiff was credited with subscriptions received by defendants; and the third an expense account of items authorized by plaintiff to be drawn against defendants, and for which plaintiff gave them vouchers. The subscription account on June 16, 1902, showed credits to plaintiff from sales of 712 shares of stock, amounting to $71,200. The debit side of this account showed that the defendants paid plaintiff $50,000 on the 14th day of August, 1901, $5,000 on the 28th day of February, 1902, $200 on the 2d day of April, 1902, and $100 on the 2d day of June, 1902, making a total of $55,300, leaving a balance of $15,900, and that they had further paid out on account of plaintiff, as shown by the disbursement account, $23,513.57, leaving a balance of indebtedness from plaintiff to defendants of $7,613.57 on that date. At a meeting of the executive committee held on the 30th day of June, 1903, a resolution was adopted that the indebtedness of plaintiff "due to Messrs. Knauth, Nachod & Kuhne, as per account rendered, be liquidated and settled," and notice was directed sent to the preferred stockholders containing account of plaintiff's business to July 1st that year.

It appears that defendants, from time to time, rendered statements of these accounts to plaintiff, and received receipts from the treasurer of the plaintiff, acknowledging the correctness thereof. One of these

receipts is dated October 8, 1902, showing that the charges made by the defendants to the plaintiff of $23,513.57 in the disbursement account were correct. Other similar receipts were given by the treasurer of the plaintiff to defendants, showing the correctness of the account rendered by defendants, on August 21 and on September 30, 1902. It appears that entries were made in the books of the plaintiff in accordance with such statements of account. Wicker, who was a director and vice president of plaintiff, testified that until the trial of the action he had no knowledge that defendants charged to plaintiff's account the expense of sending out the circulars. It appears, however, that on the 14th day of August, 1901, plaintiff's treasurer withdrew from its deposit account with defendants $326.06 for the payment of charges for sending out subscription circulars mailed by officers of plaintiff inviting subscriptions to the stock, and that a receipt therefor was given to defendants, signed by plaintiff's treasurer. It appears that the plaintiff employed an audit company on or about the 12th day of July, 1901, which daily audited its accounts from that time on. Other minutes of the executive committee and action of the officers of the plaintiff show that it took an active interest in obtaining subscriptions for this stock.

No attempt was made to offset this claim against plaintiff's liability to defendants on any of these accounts, and no account or record was produced in which this claim or any part of the alleged subscription was charged to defendants. It was essential to the success of the business which the plaintiff was organized to conduct that its stock should be placed with banks and banking houses throughout the country in small amounts. This would more certainly insure its success than if the stock were sold in bulk to the defendants, as claimed. A sale in bulk would give the plaintiff money, but not business; and it could best get business from those interested through ownership of the stock. This was expressly assumed by the court throughout the trial, without objection, and was so stated in the charge, without exception. The learned counsel for the appellants contends that great weight should be attached to this, and that it tends to sustain their claim that it was not the intention of the parties that the defendants should forthwith subscribe for and take the entire issue of preferred stock at par. Defendant Kuhne accounts for the failure to execute a formal subscription agreement upon the ground that it was understood that the whole matter was sufficiently covered by the underwriting agreement, and the evidence shows that the plaintiff, instead of issuing the preferred stock and tendering the same to the defendants and demanding the par value thereof in cash, only issued to subscribers procured by defendants from time to time as subscriptions therefor were obtained by the defendants and reported to it, and the plaintiff took an active part in obtaining such subscription agreement by preparing and distributing, at its own expense, as already shown, circulars explaining the business which it desired to transact and inviting subscriptions to the preferred stock.

Plaintiff's explanation of the failure to have a formal subscription executed is not convincing. The official minutes show that the offer

was made by defendants in behalf of others. That entry in the minutes should not be outweighed by Goodall's testimony, which is contradicted by his own acts and by official action in which he participated, and is almost wholly uncorroborated on this vital point, and is controverted to some extent by part of the testimony of every other witness; for no one else in plaintiff's behalf questions the correctness of the minutes. The reasonable inference to be drawn from the evidence as a whole is that defendants were to subscribe for the stock as contemplated in the underwriting agreement, but were not to be obliged in the first intance to take and pay for it, nor were they to be free to place it where and on such terms as they saw fit. All of these things would doubtless have been provided for in the subscription agreement, had it been prepared. The parties dispensed with that formality, and all of their subsequent acts, until after Kuhne resigned as president, show a practical construction of their agreement in accordance with these views.

The execution of the voting trust agreement, which was one of the conditions imposed by the defendants, was authorized by the executive committee on the 12th day of July, 1901. Defendant Kuhne was given full power with respect thereto, and on the 18th day of July, 1901, he reported to the executive committee that such an agreement had been negotiated with the Colonial Trust Company, which was to act as depositary of the stock. The agreement, however, was not actually executed until the 1st day of October, 1901. By that agreement the defendant Kuhne and two other members of the plaintiff's executive committee were made the trustees to hold the legal title to, and to vote, the common stock. The defendants point to this agreement as showing the exercise of extensive powers by the executive committee, and the plaintiff points to it as constituting an admission by defendant Kuhne, who signed it, that his firm agreed to subscribe for all of the preferred stock. It recites that plaintiff's board of directors, on the 29th day of April, 1901, decided to comply with certain conditions prescribed by Kuhne, preliminary to the acceptance by him of the office of president "and the taking of a financial interest" in the association, and that pursuant thereto the common stock had been reduced and the preferred stock increased, "which preferred stock has been, in pursuance of the offer of Mr. Kuhne, entirely subscribed by the firm of Knauth, Nachod & Kuhne."

Defendants claim that this recital should be construed in the light of the offer actually made by them on the 4th day of June, which, according to their evidence, was to subscribe for all of the stock on behalf of themselves and others who were subscribers to the underwriting agreement, and that, when the voting trust agreement was prepared, it was expected that the stock would be formally subscribed for in accordance with Kuhne's offer. This appears to be a reasonable construction, which is in accord with the practical construction. In this connection, it may be observed that the minutes of the meeting of the board of June 4th were read and approved in the presence of defendant Kuhne at the meeting of June 17th, and at this meeting Secretary Stumpf resigned and an employé of defendant Kuhne was

elected to succeed him. Plaintiff claims that this was the final step putting defendants in full control of its affairs. Plaintiff also claims that from that time on until the defendant Kuhne and the newly elected secretary resigned, late in 1903, defendants exercised full do- minion over plaintiff's affairs, keeping and auditing its accounts, and charging to plaintiff on its books the expense of selling the preferred stock, without the knowledge of those interested in the affairs of the plaintiff.

Observations already made show that this claim is not fully sus- tained, and that the bookkeeper and treasurer of plaintiff had full knowledge of these things, and all others interested in plaintiff might have obtained like knowledge, as nothing was concealed, and the action of the executive committee with respect to distributing subscription blanks shows that they deemed plaintiff directly interested in thus· placing the stock. It may be observed, however, that the authority to conduct the affairs of this corporation was duly vested in its .board of directors, and when they were not in session in the executive commit- tee, and no claim is made that any of their acts were ultra vires, un- less, perhaps, an attempt to cancel the alleged subscription agreement, to which action reference will be made presently. Some one had to act for the plaintiff. Defendant Kuhne was duly selected as a director and as president, and made ex officio the chairman of the executive committee, with full knowledge on the part of the stockholders of the business relations existing between the plaintiff and his firm, and there- for the plaintiff is not in a position to claim that it should neither be bound nor estopped by the action of the executive committee merely because Kuhne was a member thereof, and may have had and exercised some influence with or over his fellow members in the interest of his firm and contrary to the interests of the plaintiff.

There is no charge or proof of fraud on his part, nor could it be said on the evidence in the record, even if that were a question which this court might consider, that the action taken in abandoning the further issue of preferred stock was or was not for the interests of the plain- tiff. That was a business matter, submitted to the sound discretion of the board of directors, or of the executive committee acting in their place. It is to be borne in mind that no rights of creditors are here involved. It may be that creditors would not be bound by the action of such an executive committee, when the law requires that the affairs of the corporation shall be managed by a board of directors; but surely the corporation itself cannot complain of this when it was expressly authorized by the stockholders.

Prior to the 30th day of September, 1901, 712 shares of the prefer- red stock had been issued, sold, and paid for, on which $71,200 was realized. On that day there was a meeting of the executive commit- tee, at which the president and vice president, Wicker, Stumpf, and Goodall were present, and the minutes show the following:

"Mr. Kuhne reported on the preferred stock, and on the advisability of $25,- 000 being returned to the treasury of the company. On motion, it was re- solved to refer the matter to counsel and Mr. Kuhne for action."

These minutes were approved at the next meeting of the executive committee, held November 14, 1901. Wicker testified that Kuhne at this time expressed the desire to have the $25,000 returned to the treasury, inasmuch "as the subscription to his underwriting, or to the firm of Knauth, Nachod & Kuhne's underwriting, had ceased, and we apparently had money enough for the current expenses of the company," and that they all opposed canceling the subscription for the unpaid balance of the stock; but in compliment to Kuhne, they referred it to him and the attorney, with power to act, intending thereby to retire the stock or not as he and the attorney deemed advisable. This testimony is contradicted by the record. If it had been deemed more to the interest of the plaintiff to enforce the alleged subscription than to cancel it, the action thereon would scarcely have taken the form of delegating the whole matter to the party in interest; and the further sale of stock, which down to that time had been rapid, would not have been suspended. The authority to issue the stock was not complete until July 11, 1901, and prior to September 30th thereafter defendant had sold 712 shares.

At a meeting of the executive committee held on the 14th day of May, 1903, which is the next record of the matter, the following action was taken:

"Referring to the resolution passed on September 30, 1901, in reference to returning to the treasury $25,000 preferred stock, and the unanimous expression at that time that said stock should be returned to the treasury, and this action being confirmed by the committee at that time appointed, on motion, duly made by Mr. C. M. Wicker, and seconded by Mr. Edwin Goodall, it was unanimously resolved that $25,000 of the preferred stock be not for the present issued, but that the same be retained in the treasury of the company as treasury preferred stock."

It was shown that defendant Kuhne at this meeting offered the following for adoption:

"Referring to the resolution passed on September 30, 1901, in reference to returning to the treasury $32,500 preferred stock, and the unanimous expression at that time that said stock should be so converted to the treasury, and this action being confirmed by the committee at that time appointed."

Some significance appears to be attached to the difference in the phraseology in the added part of the resolution, but I fail to see any significance in it. The resolution as reported was incomplete. It called for no action and declared no result. It was necessary to add to it in order to constitute it a resolution. As I view the statement presented by Kuhne, it was more unfavorable to the defendants than the added matter. Technically, the stock could not be returned and converted to the treasury unless it had been issued, nor, if issued, without the consent of the party to whom it had been issued; but the added matter was more in accordance with the true facts if the stock had never been issued, and the action taken, if not, in effect, a repudiation by the plaintiff of any obligation on its part to deliver the stock to the defendants at that time, at least shows that plaintiff understood that it still had full control of the stock, which would not be the case if the defendants had bought it. None of the remaining 288 shares had at this time been issued or tendered, to the defendants or to any-

one else, excepting the 3 to others as herein stated. It is not claimed that the action of the executive committee is open to the construction that it was recognized that this stock had been issued and that it was intended to repurchase the amount specified and place the same in the treasury; nor does the record of the action taken bear that construction. Had it been intended to purchase stock already issued or this, on the theory that it had been subscribed for, action would have been taken with respect to the price to be paid. It is evident that the resolution related to stock over which plaintiff had full control; for, if it had been recognized that the defendants had any interest therein, they would have been consulted, or the record would have shown that Kuhne had consented for them. It may not be inferred that they were to remain liable merely because Kuhne knew of the action taken. It is perfectly plain that the matter originally discussed by the executive committee on the suggestion of Kuhne on the 30th day of September, 1901, was with reference to the advisability of withholding for the time being the issue of the balance of the preferred stock and reserving the same, while not strictly as treasury stock, for it had never been issued, still as unissued stock, to be issued at such time as the interests of the association might require, and it is clearly evident that such was the object and purpose of the resolution offered by Wicker and adopted by the executive committee on the 14th day of May, 1903.

Kuhne's explanation of the action is that it was considered that the association had sufficient funds with which to commence business, and that it was thought that the stock would appreciate in value because it bore accumulative dividends, and it was deemed advisable to hold 250 shares, and that it was decided to hold the remaining 38 shares to be disposed of to especially desirable customers who might ask for stock. He also testified that after September 30, 1901, several subscriptions for stock were received, but that they were not accepted, and thereafter only 3 shares were sold, 2 on April 22, 1902, and 1 on the 2d day of June, 1902. The action in each instance was manifestly with respect to something over which the executive committee assumed to have control. The authority of the executive committee to act for plaintiff seems never to have been questioned, nor is it claimed that the board of directors was in session at the time of any act in question by the executive committee, so as to oust it of jurisdiction. From the organization of the executive committee the affairs of plaintiff appear to have been, in the main, managed and controlled by it without objection and under circumstances indicating acquiescence on the part of the stockholders and board of directors. Moreover, there would seem to be no object in going through the formality of issuing the stock, which had not yet been issued, and then purchasing the same back.

This action is not conclusive on the question as to what the original arrangement between the plaintiff and the defendants was; but, assuming that such arrangement was as claimed by plaintiff, then we have the executive committee, on the suggestion of one of the defendants, who was chairman thereof, taking action with a view to modifying the contract by consent—the fair inference, of course, being that,

since Kuhne suggested it, his firm would not insist upon the right to have the stock delivered, even though it had subscribed for all. The action is most important as tending to show estoppel on the part of the plaintiff from now seeking to enforce the contract as to the balance of the stock against the defendants. On the 23d day of May, 1903, a letter was addressed and mailed by Goodall, as secretary of the executive committee, to the defendants' firm, informing them of the action taken by the executive committee on the 14th of the same month, by quoting a copy of the report and of the resolution adopted. The day following the action of the executive committee a letter was prepared, to be signed by Goodall as treasurer, and addressed to the defendants' firm, the authorship of which is not clearly shown, but which plaintiff claims was prepared by Kuhne, for the reason that at the end thereof are words in Kuhne's handwriting as follows: "'To be signed by Edwin Goodall, Treas." Kuhne claims that he merely approved it. But it is quite immaterial whether he prepared or only approved it. It differs from the letter actually sent only in that, after the word "adopted," preceding the quotation, it contained the following:

"And that, owing to the unissued preferred stock, amounting to $25,000, being returned to the treasury, you are hereby relieved of disposing of any further stock."

That may be the legal effect of the action of the executive committee, but it was not so recited in the resolution adopted. The effect of the action actually taken by the executive committee, if valid, was to relieve them of any further liability to dispose of the stock, and, if so, it is immaterial whether the liability was absolute in the first instance to take all of the stock, or only to take such of it as should not be thus disposed of, because relieving the firm from liability to dispose of the stock would necessarily relieve it from liability to take the stock undisposed of. The secretary had no authority to incorporate anything in the notice, excepting the action of the executive committee, and the letter as originally drafted was doubtless modified on that theory to conform to the express action of the executive committee; but it is quite immaterial whether Goodall failed to sign in the original form for the reason that the letter as thus prepared contained statements which he was not authorized to make, or whether it was because the statement was not in accordance with his understanding as to the effect of the action taken.

It appears that on the 19th day of August, 1903, some three months after the date of these letters, Kuhne wrote a letter resigning the presidency of the plaintiff, and his resignation was accepted on the 7th day of October thereafter, and Wicker was immediately elected his successor. The reason for this resignation was plaintiff's determination to engage in a foreign exchange business in competition to Kuhne's firm, the members of which objected to his remaining president. Plaintiff claims that prior to the action of the executive committee, to which reference has last been made, Kuhne contemplated resigning the presidency, and that he had the action taken by the executive committee with a view to making a record which would tend

to relieve the defendants from liability for failing to sell the unissued stock. There is little upon which to found this argument. The action of the executive committee in May, 1903, resulted from the action of September 30, 1901, at which time further sale and issue of stock was suspended. During all the intervening time the directors of the plaintiff were chargeable with knowledge of the fact that the matter of abandoning the further issue of the preferred stock had been brought up by the executive committee and referred, and that no final action had been taken thereon, and that in the meantime there was no further issue of the stock, and that no demand was made upon the defendants to take the same. Moreover, other action was taken in the meantime, indicating that it was understood that the remaining stock would not be issued and that there was no further liability on the part of the underwriters.

It appears that after the question as to the advisability of not further issuing preferred stock had been referred to the defendant Kuhne and the attorney on the 30th day of September, 1901, and on or about the 3d day of March, 1902, an informal apportionment of common stock to the subscribers to the underwriting agreement was made, by which they were given an amount of the common stock equal to two-thirds of the amount that they would have been entitled to had the entire issue of preferred stock been placed, which approximated the amount, in round figures, to which they were entitled on the basis of the amount of preferred stock actually issued, which, as already observed, was 71⅕ per cent. of the entire issue of preferred stock, as they received, instead of that percentage of the amount of the common stock, 66⅔ per cent. In transmitting the certificate to the defendants for their share, it was inclosed with a letter sent by Goodall, as treasurer of the plaintiff, stating that it was "in return for the underwritten agreement executed on the 18th day of April, 1901." The defendants, in making distribution to the subscribers, inclosed the stock with a letter signed by themselves, the contents being the same as that of the letter from the treasurer of the plaintiff to them herein quoted, but it contained the following additional words at the end, "and this day canceled," indicating their view or claim as to the effect of the action taken by plaintiff in thus apportioning common stock to the underwriters.

When Kuhne resigned as president of the plaintiff, the defendants returned the 50 shares of the common stock theretofore allotted to them. It also appears that 475 shares of the new issue of the common stock was issued to the defendant Kuhne, probably as compensation for his services; and when he resigned as president he likewise returned that. The only profit or charge that the defendants were to secure by the underwriting agreement or on the alleged subscription for the stock, as they understood and executed it, was their proportionate share of the new issue of common stock pursuant to the underwriting agreement, which provided that each subscriber should receive in common stock 30 per cent. of his subscription to the preferred stock. Stress is laid by the learned counsel for the respondent on the fact that the distribution of the common stock under the underwriting agreement is

inconsistent with the cancellation of it, and that it could not be deemed canceled without the return of all of the common stock issued to subscribers.  It appears, however, that the defendants returned all that was issued to them, and their rights, as between them and the plaintiff, are not affected by the question as to whether the other stock so issued was returned.  Moreover, it was the apportionment of the stock between the underwriters, long after subscriptions had ceased, without demanding that the balance be taken, which is significant as indicating an intention to abandon or rescind the further execution of the alleged subscription agreement.  The action, therefore, more than two years later, was apparently in accord with what might be expected from the acquiescence of both parties in not issuing or negotiating further stock in the meantime.

On the 11th day of December, 1903, a special meeting of the board of directors was held, with the newly elected president in the chair. The question of calling on defendants to take the balance of the preferred stock was brought up and discussed, and it was decided to issue the same, and to tender the defendants a certificate for 288 shares, and to demand the face value thereof.  Kuhne was not present at this meeting; but he was notified thereof by telephone, and he requested an adjournment until the following day, which was accorded.  On the 12th he appeared and discussed the matter with the members of the executive committee, and asked that it be held until the 15th day of December, to enable him to discuss it with his partners, and this was done.  Nothing further was heard from him concerning it.  The next action was on the 6th day of January, 1904, when a formal tender of the balance of the stock was made to the defendants, accompanied by a demand for the payment thereof.  Goodall testified that he made repeated demands upon Kuhne between June 4, 1901, and October 1, 1901, for the amount of the subscription, and that Kuhne agreed to pay it after they got the new money orders going and things fixed up, and at one time he said that the money was not coming in as fast as they expected, and that as soon as he received it on the sale of the stock he would pay it over.  Goodall's testimony in this regard, however, is contradicted by his own correspondence and by official action in which he participated, as well as by Kuhne.  In August, 1901, Kuhne was in Saratoga, and Goodall addressed letters to him there concerning the subscriptions which were being received for the stock and inquiries relative thereto, and discussing the question of having the Hackensack Trust Company requested to carry the underwriters' agreement for $40,000 to put into the treasury of the company, to make, with the amount already received from the sale of the stock, the amount to be realized on the sale of the entire issue of preferred stock, and showing that as an officer of the plaintiff he was active in giving information and procuring subscribers for the stock.

There is no credible evidence in the record of any disagreement between the trustees and officers of the plaintiff concerning its management during the period that the defendant Kuhne was president. All of the record evidence, and all testimony which is not improbable, as tending to impeach the record evidence, tends to show that, what-

ever the original contract between the defendants and plaintiff was
with respect to the subscription—which was left in doubt on con-
flicting evidence—the practical construction of the parties throughout
this entire period was that the defendants had not obligated themselves
to take the entire issue of preferred stock in the first instance. Al-
though Goodall testifies that he repeatedly demanded the whole amount
of the defendants, upon the theory that they were primarily liable
therefor, which testimony is not consistent with the letters written by
the witness himself and is contradicted by the preponderance of the
evidence, yet it is not pretended that the stock was ever issued or ten-
dered to the defendants, excepting as the defendants reported having
received subscriptions, and was then issued to the subscribers through
the defendants until the 6th day of January, 1904.

I am therefore of opinion that the parties should be bound by the
practical construction of their contract, and that the verdict is against
the weight of the evidence. The evidence is overwhelming that the
plaintiff abandoned any claim to hold the defendants as subscribers to
this stock, and are now estopped from asserting a liability upon that
theory; but it appears that the defendants did not present that ques-
tion for decision or for an instruction to the jury upon the trial. The
jury, as appears by the questions asked when they were brought into
court and further instructed, seem to have deemed the question of
abandonment, estoppel, and rescission, on which they had received no
instructions, quite important, and they requested instructions as to
whether the resolution declaring that no further stock be issued for
the present was valid; but the learned court said, in substance, that
the executive committee could not rescind the subscription agreement,
and that the defendants made no claim in that regard, and had ac-
quiesced in the submission to the jury of the single question of fact
as to whether the defendants agreed to subscribe for and take the
stock. The record shows no express renunciation of any of their
rights; but it is true that no other question had been submitted to the
jury, and that defendants had not requested a ruling on these points.
After this last statement by the court, counsel for defendants did not
assert that the court was in error, but merely excepted to the instruc-
tion that the resolution would not be sufficient to cancel a subscription
if made. This exception might be sufficient to present the question as
to whether the subscription agreement had not been rescinded, had de-
fendants requested any instruction on that point originally, and had
they not by silence assented to the statement of the court that they
made no claim that the adoption of the resolution released them, if
they had incurred liability. The persistence with which some of the
jurors, on being summoned into court for further instructions, pro-
pounded questions to the court that were material to a proper decision
of their case, but had not been presented by counsel for defendants,
indicated reluctance on their part to determine the issues on the single
question of fact to which they were thus restricted by the court; and
it is not unlikely that, being absorbed with the other question, they
failed to appreciate the weight of the evidence material to a proper
determination of the issues submitted.

I deem it unnecessary to consider the other interesting questions presented by the record, which have been argued at length by the learned counsel for the respective parties; for I think a new trial should be granted on the ground that the verdict is against the weight of the evidence.

It follows that the order and judgment should be reversed, and a new trial granted, with costs to the appellants to abide the event.

CLARKE and HOUGHTON, JJ., concur.    SCOTT, J., concurs in result.

INGRAHAM, J. (concurring).    The complaint alleges that plaintiff was a corporation organized under the laws of the state of New Jersey, with a preferred stock of the par value of $50,000 and common stock of the par value of $450,000; that on the 25th of May, 1901, the preferred stock was increased, so that its par value was $100,000, and the common stock was reduced, so that its par value was $200,000; and that on or about the 4th of June, 1901—

"the defendants duly subscribed for and agreed with the plaintiff to take one thousand shares of the plaintiff's preferred capital stock, and then and there agreed to pay to this plaintiff the sum of one hundred dollars per share for said stock, or the sum of one hundred thousand dollars."

There is no allegation of a sale of the stock by plaintiff to defendants, and the complaint would seem to be based on a subscription for capital which had not been issued, rather than a sale of stock by a corporation who had in some way acquired a portion of its stock. From the evidence it appeared that all of the common stock, except 1 share, viz., common stock of the par value of $449,000, was issued to one Edward Goodall for certain patents, which he assigned to the company and under which it was to transact its business. There is no evidence that I can find that at the time of the agreement alleged in the complaint the plaintiff had authority to issue any stock except the original preferred stock, of the par value of $50,000. On this evidence it would appear, therefore, that defendant's subscription would only be binding on either party for the stock that the company had power to issue, which was 500 shares of preferred stock, and the defendants have paid a sum in excess of the amount due for that stock; $50,000 having been paid by defendants to the plaintiff on August 14, 1901.

The evidence that the common stock that had been issued had been returned to the plaintiff, who had retained some of the common stock as what was called "treasury stock," does not show that the plaintiff had on June 4, 1901, power to issue more than 500 shares of preferred stock. But, assuming that there was evidence that the plaintiff had authority to issue 1,000 shares of preferred stock, I concur with Mr. Justice LAUGHLIN that the finding that there ever was an unqualified subscription of the whole of the 1,000 shares of the preferred stock by the defendants is against the weight of the evidence, and I therefore concur in the reversal of the judgment.